UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No. 07-cv-02655-WYD

KELLYE W. MONAGHAN,

      Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

      Defendant.

_____

**ORDER**

_____

I.    <u>INTRODUCTION</u>

THIS MATTER is before the Court on review of the Commissioner's decision that denied Plaintiff's applications for disability insurance benefits and supplemental security income and benefits under Titles II and XVI of the Social Security Act ["the Act"], 42 U.S.C. §§ 401-33 and 1381-83c (Transcript [Tr.] 83-85, 404-08).  For the reasons stated below, this case is reversed and remanded for further factfinding.

Plaintiff was born in December 1962, and was 41 years old on her alleged onset of disability date and 44 years old on the date of the ALJ's decision.  (Tr. 39, 83.)  She has a high school equivalent education (*id*. 105), and has worked as a convenience store clerk, fast food worker, and front desk clerk.  (*Id*. 119, 447.)  In January 2004, Plaintiff was struck by a car while riding a bicycle on a sidewalk.  (*Id*. 203.)  She was not wearing a helmet.  The force of the collision ejected Plaintiff from her bicycle and threw

her about 15 feet.  Plaintiff's applications claimed that she became disabled on January

29, 1994, due to a head injury from this accident.  (*Id.* 99-100.)

The Colorado Disability Determination Services denied Plaintiff's claims at the

initial determination stage.  (Tr. 48-49, 51-54.)  Plaintiff then requested a hearing, and a

hearing was held on March 14, 2007.  (*Id.* 422-49.)  In a decision dated April 22, 2007,

the Administrative Law Judge ["ALJ"] concluded at step four of the sequential evaluation

that Plaintiff was not disabled within the meaning of the Act.  (*Id.* 23-39.)  I address this

decision in detail below.  The Appeals Council declined review of the ALJ's decision.

(*Id.* 111-14).  This appeal followed.  The ALJ's decision is the final administrative

decision, and this case is ripe for review pursuant to 42 U.S.C. § 405(g).

II.   ANALYSIS

A.   The ALJ's Decision

The ALJ made the following findings:

1.   Plaintiff met the insured status requirements of the Act through December
     31, 2006 (Tr. 29, Finding 1).  Plaintiff had not engaged in substantial
     gainful activity from January 29, 2004, the alleged onset date. (*id.*, Finding
     2).

2.   Through the date last insured, Plaintiff had the following "severe"
     impairments:  major depression, post traumatic stress disorder,
     personality disorder not otherwise specified, and methamphetamine
     dependence in partial remission (*id.*, Finding 3).  Plaintiff's headaches and
     left ankle giving out were not severe impairments, and Plaintiff had no
     severe physical or cognitive impairments (*id.* 31-32).  Plaintiff's
     psychological symptoms "show significant improvement . . . when she is
     compliant with medication and abstinent from drug use" (*id.* 32).  Plaintiff's
     severe impairments did not meet or medically equal the criteria of any of
     the impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 (Listing of
     Impairments) (*Id.* 33, Finding 4).

3.   Through the date last insured, Plaintiff had the residual functional capacity
     ["RFC"] to perform unskilled work with simple repetitive tasks (Tr. 34,

Finding 5.)  Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms complained of by Plaintiff, but her "statements concerning the intensity, persistence, persistence and limiting effects of these symptoms are not credible" (*Id.* 35.)

4.    Given Plaintiff's RFC, Plaintiff was not prevented from performing her past unskilled work as a convenience store clerk and fast food worker (Tr. 38, Finding 6).  "The claimant demonstrated the ability to perform unskilled work prior to her alleged disability onset date despite her history of psychological impairments and her drug use.  There is no showing that the January 24, 2004, accident caused any permanent aggravation. Therefore, it is logical to conclude that the claimant is still capable of work she did in the past" (*id.* 33).  Thus, Plaintiff was not disabled under the Act from her alleged onset date through the date of the decision (*id.* at 38, Finding 7).

B.    <u>Standard of Review</u>

A Court's review of the determination that a claimant is not disabled is limited to determining whether the Commissioner applied the correct legal standard and whether the decision is supported by substantial evidence.  *Hamilton v. Sec. of Health and Human Servs.*, 961 F.2d 1495, 1497-98 (10th Cir. 1992).  Substantial evidence is evidence a reasonable mind would accept as adequate to support a conclusion.  *Brown v. Sullivan*, 912 F.2d 1194, 1196 (10th Cir. 1990).  "It requires more than a scintilla of evidence but less than a preponderance of the evidence."  *Gossett v. Bowen*, 862 F.2d 802, 804 (10th Cir. 1988).

"Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).  Further, "if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from substantial evidence."  *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993).

C.      Whether the ALJ's Decision is Supported by Substantial Evidence

1.      Whether the ALJ Properly Weighed the Medical Evidence

Before addressing Plaintiff's impairments, I first address the ALJ's decision to give controlling weight to the opinions of Dr. Pollack and the state agency physicians and to give no weight to the opinion of Dr. Healy who performed an independent medical examination ["IME"] of Plaintiff.  (Tr. 31.)  That decision impacts the analysis of Plaintiff's impairments.

Dr. Pollack began treating Plaintiff in March 2004.  (Tr. 317.)  He diagnosed a head injury with brief loss of consciousness, noting Plaintiff's post-concussion confusion and agitation with no specific cognitive deficit elicited on examination, and intact memory and orientation.  (*Id.*)  He also diagnosed left olecranon bursitis, cervical strain and myofascial stiffness and pain.  (*Id.*)  Dr. Pollack treated Plaintiff through November 2004, at which time he discharged her from his care, concluding that she had reached maximum medical improvement with no restrictions, impairment, disfigurement, or need for follow-up.  (*Id.* 289-90.)

The ALJ considered Dr. Pollack a treating physician and gave controlling weight to his opinions as well as those of the state agency physicians.  However, there is evidence in the record that Dr. Pollack was evaluating Plaintiff only in connection with injuries that he believed she sustained from the bicycle accident, not in connection with any other impairments she had.  This appears to be due to the fact that the treatment of Plaintiff by Dr. Pollack was covered by California Casualty, the insurance carrier for the driver who struck Plaintiff.  For example, Dr. Pollack notes in a letter dated December 15, 2004, that he discharged Plaintiff:

-4-

> with regard to any physical residuals of her injury [from the bicycle accident] a number of weeks ago, and recently for the residual psychological deficits attributable to the injury of January 29, 2004.  I consider that she has no impairments and no psychological disorder caused by that accident.

(*Id.* 287-88, *see also* 296.)  Dr. Pollack does not indicate that Plaintiff has no impairments, only that she has no impairments caused by the accident.  The ALJ failed to consider this in giving controlling weight to Dr. Pollack's opinions.  Further, he failed to consider the fact that Dr. Pollack may not have been a true treating physician since he was seeing Plaintiff only for a limited purpose.

Moreover, I agree with Plaintiff that the ALJ failed to properly consider the fact that Dr. Pollack recommenced treatment of Plaintiff as a result of Dr. Healy's IME.  After Dr. Pollack had terminated Plaintiff's treatment, Dr. Healy opined that Plaintiff was still suffering from and required treatment for the following car-bike related injuries:  right supraorbital neuralgia; chronic cervical strain and left suboccipital myofascial pain with trigger points and headaches; symptoms of posttraumatic stress disorder with headaches; left lower lumbar strain; left hip posttraumatic bursitis; and left lateral ankle strain and chronic pain.  (Tr. 346-49.)  He estimated a need for at least three to six months of intensive treatment, after which he recommended Plaintiff be re-evaluated as to any need for more treatment.  (*Id.* 349.)  In response to a question about whether Dr. Pollack's treatment had been reasonable and necessary, he reported, "Yes, it has just been inadequate." (*Id.* 347.)  As of February 2005, Dr. Healy believed Plaintiff was incapable of any work.  (*Id.* 351.)

Dr. Pollack resumed treatment in June 2005 as a result of the IME findings of Dr. Healy.  (Tr. 356-57.)  He found Plaintiff not to be "recovered" as he had previously

-5-

opined, but still suffering from cervical sprain, head injury, ankle sprain and myofascial pain. (*Id.* 358.)  Objective findings included an initial oddity of speech, tenderness in the left shoulder and spine area, and tenderness of the left ankle.  (*Id.* 357-58.)  Thus, Dr. Pollack's opinions substantiated, at least to some extent, the findings by Dr. Healy.  Dr. Pollack's treatment plan included obtaining two MRI's, physical therapy, medication, and consultations with other medical specialists.  (*Id.*)  Months of additional treatment were then rendered.

There is an obvious inference from this subsequent treatment that Dr. Pollack agreed that Plaintiff was not at maximum medical improvement from the accident and that she had impairments that still needed to be treated and/or assessed.  Further, while Dr. Pollack did opine in June 2005 that there was no requirement for restriction of activities, he noted the need for future consultations by experts including a physiatrist (pain management specialist) and an orthopedist as well as a potential need for multiple injections to address current pain.  (Tr. 358.)  The ALJ failed to properly consider these issues in evaluating both Dr. Pollack's and Dr. Healy's opinions.

Further, the June 2005 report appears only to be Dr. Pollack's best guess that Plaintiff might recover in the future.  (*Id.*—Maximum therapeutic benefit is *anticipated* within the next six or eight weeks") (emphasis added).  The ALJ did not address whether this guess was actually substantiated by the record.  If the record was unclear on this issue, the ALJ had a duty to develop the record on this issue.  *Maes v. Astrue*, 522 F.3d 1093, 1097 (10th Cir. 2008).

I also find that the ALJ erred in rejecting Dr. Healy's opinions outright, when it appears that Dr. Pollack substantiated at least some of the impairments noted by

Dr. Healy.  This means that the ALJ's finding that Dr. Healy's assessment was not consistent with Dr. Pollack's opinions is not necessarily supported by substantial evidence.  Further, some of Dr. Healy's findings were substantiated by other doctors. For example, Plaintiff's headaches and pain were documented throughout the record by Dr. Vanzura, Dr. Cookson, Dr. Kenneally, and others.  (Tr. 396, 388, 390, 284-85.)

Finally, I question the ALJ's reliance on the state agency physicians regarding Plaintiff's physical impairments, as they did not examine the Plaintiff and did not do a written report explaining what records they reviewed and what they based their decision on.  *See Frey v. Bowen*, 816 F.2d 805, 813 (10th Cir. 1987) ("findings of a nontreating physician based upon limited contact and examination are of suspect reliability". . . . evaluation forms that are "unaccompanied by thorough written reports or persuasive testimony, are not substantial evidence.")  *Id.*  Further, Plaintiff points out that Dr. Keener's comments were conclusory in nature and limited "as of 9-15-05."  (Tr. 319.)  There was substantial medical evidence after that which was not considered by Dr. Keener.  It is also unclear what medical records were reviewed by Dr. Keener prior to September 15, 2005, since his report did not address this.  Similar issues apply to Dr. Lerman's comments.  His comments were prepared in October 2005, earlier than much of the medical evidence in the record, and they specifically exclude any evaluation as to Plaintiff's orthopedic or mental impairments.  Finally, Dr. Lerman stated no opinions as to any functional limitations.  The ALJ did not properly take these issues into account in his assessment and weighing of their opinions.

I also find while on this topic that the ALJ did not properly weigh the mental health opinions.  First, the ALJ gave no weight to the opinions of Dr. Cookson and the

other providers from Stout Street Clinic, including the opinions of Nurse Hamilton (a Registered Nurse, Nurse Practitioner ["NP"] and Psychiatric Clinical Nurse Specialist) and Nurse Schuchman (Clinical Nurse Specialist).  Dr. Cookson made numerous findings regarding Plaintiff's mental health, and opined that Plaintiff was not able to work which impacts the RFC finding below.  (Tr. 375-76, 391.)  Nurse Hamilton and Nurse Schuchman were part of Plaintiff's treatment team at Stout Street Clinic.  Nurse Hamilton reported in August, 2006, that Plaintiff suffered from a serious mental illness, to wit: Mood Disorder and Post Traumatic Stress Disorder, and as a result of such illnesses ". . . experiences substantial impairments in functioning due to the severity of [her] clinical condition. . . for an extended duration.  (*Id.* 373, 370.)  Nurse Schuchman reported at different times in 2006 and 2007 that she agreed with the opinions of medical doctors that Plaintiff suffered from Post Traumatic Stress Disorder, Mood Disorder, Personality Disorder, and amphetamine dependance, on and off in remission.

I first address the ALJ's findings regarding Dr. Cookson.  He appeared to reject her opinions because she was not a treating physician.  However, the ALJ ignored the fact that Plaintiff was being treated by numerous sources at the Stout Street Clinic and that the Clinic as a whole appeared to be where Plaintiff was being treated for her mental health impairments after she was released from care by Dr. Pollack.  This needs to be considered on remand.  Further, opinions from any medical source must be appropriately considered and weighed.  *See Miller v. Barnhart*, 43 Fed. Appx. 200, 2002 WL 1608452, at *3 (10th Cir. 2002) (unpublished).[1]  Dr. Cookson also made diagnoses

---

[1]    Citations to this and other unpublished opinions in this Order are made because I find that the opinions have persuasive value with respect to a material issue that has not been addressed in a

and medical findings that were not properly considered by the ALJ.  Indeed, the ALJ focused only on Dr. Cookson's finding that Plaintiff could not work.

Further, to the extent that the ALJ found that Dr. Cookson's opinions were contrary to other medical evidence, her diagnoses of Plaintiff's mental impairments were substantiated by the vast majority of medical providers.  The ALJ also rejected Dr. Cookson's diagnosis of chronic pain as a basis for her decision, even though almost every provider in the record concurred with the pain diagnosis.  I find error with this, as discussed in more detail below in connection with Plaintiff's RFC.

The ALJ also faulted Dr. Cookson for not performing a thorough evaluation of Plaintiff before making her finding that Plaintiff was unable to work, and stated that "her assessment of the claimant appears to be based primarily on a cursory observation of the claimant's mental status, and the claimant's subjective statements regarding her symptoms, limitations, and medical history."  (Tr. 37.)  I find that this reason for discounting Dr. Cookson's opinions is not supported by substantial evidence.  First, it is clear that Dr. Cookson did examine Plaintiff and make medical findings as a result of her examination.  (*Id.* 392.)  A doctors's statements about Plaintiff's condition or impairments "are specific medical findings".  *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).  The ALJ errs in rejecting those opinions in the absence of conflicting evidence.  *Id.* (finding error with the ALJ's decision to reject the opinions of physicians because of the lack of "results or diagnostic tests of medical findings which led them to their conclusion" since the finding that Plaintiff's condition deteriorates under stress is a

---

published opinion.

specific medical finding).  In addition to her diagnoses of chronic pain, personality

disorder and "S/P Traumatic Brain Injury", Dr. Cookson also stated specific

symptoms/problems that needed to be alleviated to allow Plaintiff to be employable,

including Plaintiff's low tolerance for staying in any position, "c/o poor coordination and

problems with attention." (*Id.*)   Thus, to the extent that the ALJ stated that Dr. Cookson

did not provide a basis for her opinion, this was erroneous.

Second, the ALJ improperly found that Dr. Cookson's opinion was based on

Plaintiff's subjective complaints.  Nothing in Dr. Cookson's report indicates that this is

true, and the ALJ's finding ignores her examination and medical findings.  The Tenth

Circuit has made clear that an ALJ may not reject the opinions of a physician "based

merely on his own speculative conclusion that the[ir] report[s] w[ere] based only on

claimant's subjective complaints."  *Langley v. Barnhart*, 373 F.3d 1116, 1121 (10th Cir.

2004).  Moreover, the Tenth Circuit has noted that "[t]he practice of psychology is

necessarily dependent, at least in part, on a patient's subjective statements . . . . [t]he

ALJ cannot reject [a psychiatrist's] opinion solely for the reason that it was based on

[the claimant's]  responses because such rejection impermissibly substitutes [the ALJ's]

judgment for that of [the psychiatrist]."  *Thomas v. Barnhart*, 147 Fed. Appx. 755, 759-

60, 2005 WL 2114163 (10th Cir. 2005) (unpublished).

The ALJ also found that Dr. Cookson had not reviewed the medical records,

which may not be supported by the record as she indicates that there was a recent

hospital stay at the University psychiatric unit.  (Tr. 392.)  Finally, to the extent that the

ALJ rejected Dr. Cookson's opinions because she had only seen Plaintiff once when

she rendered her first opinion, this conveniently ignores the fact that the ALJ relied on a

consultative examiner who had also only seen Plaintiff once and on a state agency physician who had never seen Plaintiff.  This also needs to be properly considered on remand.

Further, as to the nurses, the ALJ found among other things that they were not acceptable medical sources.  (Tr. 37-38.)  While Defendant's regulations do not recognize a nurse as an "acceptable medical source" to determine whether one has a "medically determinable impairment", once the existence of an impairment has been determined, opinions of nurses are acceptable medical sources to show the severity of the impairment and resulting functional limitations from the impairment.  20 C.F.R. §§ 404.1513(a), (d)(1), 416.913(a), (d)(1).  Thus, once a doctor has made an applicable diagnosis, Defendant is prohibited as a matter of law from ignoring the opinions of nurses simply because they are not doctors.  *Id.*; *see also Arroyo v. Barnhart*, 295 F. Supp. 2d 214, 222 (D. Mass. 2003).

In this case, the nurses opined as to impairments by Plaintiff that were supported by other sources, including acceptable medical sources.  Thus, they were qualified to render opinions about Plaintiff's ability to work based on same.  Further, to the extent the ALJ found that their opinions that Plaintiff cannot work conflicted with those of others who had treated Plaintiff, this is not necessarily true.  Dr. Cookson found that Plaintiff could not work and Dr. Healy's findings also supported this opinion.  While a decision about whether Plaintiff can work is ultimately reserved to the Commissioner, "[t]he adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner."  *Miller*, 2002 WL 1608452, at *3.

The ALJ appeared to rely on the opinions of Drs. Pollack and Kenneally and the state agency physicians/examiners Dr. Valette and M. Berkowitz in deciding to give no weight to the opinions of the Stout Street medical providers.  However, Dr. Pollack was not a psychiatrist or in the mental health field.  Further, he opined only as to whether he believed Plaintiff's mental health impairments were caused or exacerbated by the accident, not whether the mental impairments generally were disabling or limiting.  The ALJ failed to consider these issues.  Further, Dr. Kenneally's report examined only Plaintiff's cognitive deficits, and did not address whether Plaintiff had other mental health deficits or whether she was able to work.  Finally, Dr. Kenneally's notes from her visits with Plaintiff also document many of the problems noted by Dr. Cookson and others at the Stout Street Clinic, lending support to those findings.

As to the state agency physicians, Plaintiff points out that Dr. Valette did not have all the pertinent medical records.  Indeed, Plaintiff asserts that Defendant elected to withhold from Dr. Valette all of Plaintiff's mental health treatment records and most of her physical health treatments, furnishing him only with Dr. Healey's report.  Thus, Plaintiff asserts and Defendant does not contest that Dr. Valette was without benefit of Plaintiff's Denver Health hospital records, University of Colorado hospital records, Dr. Pollack's records, Dr. Dworetsky's records, Dr. Lambden's records, or Dr. Kenneally's testing/treatment records.  Further, Plaintiff asserts that Dr. Valette apparently was unaware of Plaintiff's psychiatric hospitalization while being actively suicidal.  If Plaintiff's allegations are true, Dr. Valette's opinion certainly can not be deemed reliable since he did not have all of the relevant information.  This needs to be explored on remand.  I also agree with Plaintiff that Dr. Valette did not provide any

information as to how his exam results might translate into or otherwise relate to

vocational functional limitations.  The ALJ also failed to develop any connection

between Dr. Valette's opinions and any possible vocational functional limitations.

Finally, as to M. Berkowitz, Plaintiff states that it is unclear whether he was even

a doctor and thus whether his opinion should have been given weight.  Second, his

opinions were rendered in November 2005 on a form where he simply checked boxes,

and he did not consider months of more current medical information.  *See Frey v.*

*Bowen*, 816 F.2d 508, 513 (10th Cir. 1987) ("[F]indings of a nontreating physician based

upon limited contact and examination are of suspect reliability", a report which

"consisted solely of boxes checked on the Secretary's form to indicate his conclusions"

and which is "unaccompanied by thorough written reports or persuasive testimony" is

not substantial evidence).  These issues need to be considered on remand.  I also find

other issues that need to be addressed on remand regarding M. Berkowitz that are

discussed below in connection with Plaintiff's RFC.

Because I find that the ALJ did not properly weigh the medical evidence, as

discussed above, I find that this case must be remanded to the Commissioner for

further factfinding and analysis.

> 2.     Whether the ALJ Erred at Step Two in Failing to Find Certain of Plaintiff's
>        Impairments to be Severe

I now turn to the ALJ's step two analysis.  At step two, the agency determines

whether the claimant's alleged impairment(s) are "severe."  *Lee v. Barnhart*, No. 03-

7025, 2004 WL 2810224, at *1 (10th Cir. 2004) (unpublished) (quoting 20 C.F.R.     §§

404.1520(a)(4)(ii), (c); 416.920(a)(4)(ii), (c)).  "'An impairment or combination of

impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1521(a); 416.921(a)). "Only 'slight' impairments, imposing only a 'minimal effect on an individual's ability to work' are considered 'not severe.'" *Id.*

"In light of these definitions, case law prescribes a very limited role for step two analysis." *Id.* at *2. "Step two is designed 'to weed out at an early stage of the administrative process those individuals who cannot possibly meet the statutory definition of disability.'" *Id.* (quoting *Bowen v. Yuckert*, 482 U.S. 137, 156 (1987) (O'Connor, J., concurring). "While 'the mere presence of a condition or ailment' is not enough to get the claimant past step two, *Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th Cir.1997), a claimant need only make a 'de minimus' showing of impairment to move on to further steps in the analysis." *Id.* (quoting *Langley*, 373 F.3d at 1123).

I first address Plaintiff's mental health impairments. Plaintiff argues that the ALJ failed to consider or evaluate the diagnosis of borderline personality disorder. I agree. There is clear evidence in the record of bipolar personality disorder. (Tr. 247, 370, 375-76, 17-18.) Indeed, Dr. Pollack stated this diagnosis in his discharge summary, and while he found that it was not caused by the accident, he noted that Plaintiff was taking medications in the past consistent with that diagnosis. (*Id.* 289.) There is also other evidence in the record that supports a bipolar diagnosis. The general characteristics of bipolar disorder are one or more manic episodes and at least one or more major depressive episodes. 20 C.F.R. § 404, Subpart P, Appendix A, § 12.04(a). Manic episodes are often characterized by hyperactivity, pressure of speech, inflated self-esteem, decreased need for sleep, or paranoid thinking. *Id.* Depressive episodes are

often characterized by a pervasive loss of interest in almost all activities, decreased energy, feelings of guilty or worthlessness, difficulty concentrating or thinking, thoughts of suicide, and/or paranoid thinking.  (*Id.*)

In this case,  Dr. Cookson evaluated Plaintiff as having an abnormal, elevated rate of speech.  (*Id.* 390-92.)  She also noted in January 2006 that Plaintiff had mood lability (*i.e.*, unstable, widely fluctuating moods) with "racing thoughts, rapid speech, rambling, disorganized dress" and was tearful.  (*Id.* 389.)  Dr. Kenneally found at one time that Plaintiff was more distractible and that Plaintiff reported she was "doing too much, too fast." (*Id.* 274.)  She also stated that Plaintiff reported she was "[e]asily irritated" and that she "can't slow down, I get to bouncing off the walls." (*Id.* 280.)[2]  All of these could be indicative of Plaintiff' bipolar disorder.

The record also shows a diagnosis of Pain Disorder Associated with Both Psychological and a General Medical Condition, suicidal ideation resulting in an involuntary hospitalization for having suicidal tendencies, and low I.Q.  (*Id.* 225-27, 281, 285, 227, 303, 366.)  These impairments were not properly evaluated and/or were ignored by the ALJ.  I find that this error that requires remand.

I further agree with Plaintiff that the ALJ needs to reassess whether Plaintiff's headaches meet the severity definition.  The record clearly shows that Plaintiff suffered from headaches.  The headaches were confirmed by treating physician Dr. Pollack as

---

[2]  Plaintiff also testified that she has recurring instances of depression, which she described as being "lows."  (Tr. 435.)  When experiencing a "low," Plaintiff is unable to get out of bed and thus arguably could not report to work.  Plaintiff's suicidal behavior in June, 2004 may have been a manifestation of her depression.  When not having a "low", Plaintiff often experiences a "rage" that comes and goes without pattern.  (*Id.* 439.)  Her mind tends to race and she raises her voice and snaps at other people.  These appear to fit rather squarely the definition of manic episodes. That sort of misbehavior has resulted in reprimands to Plaintiff.  (*Id.*)

well as Dr. Cookson and Dr. Healey, the only examining source to consider headaches. (Tr. 292, 345, 346, 356, 390, 397).  The ALJ declined to find that the headaches were severe because he found that the record did not document the frequency or severity of the headaches.  (*Id.* 31.)  However, that finding ignores Dr. Healey's finding that these headaches happened three or four times weekly and were of such severity that Plaintiff was left bed-bound.  (*Id.* 345; *see also* 279—headaches occur 2-3 times a week). Plaintiff gave testimony of similar frequency and severity.  (*Id.* 435.)  Further, if the record lacked evidence as to their duration and frequency, it is the duty of the ALJ, not Plaintiff or her counsel, to develop the record on this issue.  *Maes v. Astrue*, 522 F.3d 1093, 1097 (10th Cir. 2008).

   The ALJ also found that the record contained no limitations related to headaches.  However, this ignores Dr. Healy's finding that Plaintiff was bed-ridden when the headaches occurred.  *See* Soc. Sec. Reg. 85-28, 1985 WL 56856, at *4 (1985) ("great care should be exercised in applying the not severe impairment concept  . . . . "[i]f an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation process should not end with the not severe evaluation step . . . . [r]ather, it should be continued.")

   Plaintiff also argues, however, that the evidence of headaches is unrebutted by any conflicting medical evidence.  I disagree, as there is the medical record from Dr. Lambden that Plaintiff's headaches were asymptomatic as of September 2005.  (Tr. 362.)  The ALJ properly noted that in his opinion.  (*Id.* 31.)  The ALJ also found that Plaintiff "reported significant improvement in her headaches with physical therapy",

referring to Dr. Lambden's record. (*Id.*)  While this is correct, Dr. Lambden saw Plaintiff multiple times but all of his records except those of one visit are missing from the record.  The one record of Dr. Lambden that the ALJ relied on clearly referenced the fact that he saw Plaintiff on other occasions.  The ALJ should obtain those missing records on remand, so that he/she has an accurate picture of Dr. Lambden's treatment of Plaintiff.  *See Carter v. Chater*, 73 F.3d 1019, 1022 (10th Cir. 1996) ("[a]n ALJ has the duty to develop the record by obtaining pertinent, available medical records which come to his attention").

Further, I agree with Plaintiff that the fact she was "currently asymptomatic" as to her headaches on a given date in one record does not necessarily mean that Plaintiff's headaches were cured, especially since Plaintiff required subsequent treatment for the headaches.  (*Id.* 397, 390.)  This must also be properly considered.  Plaintiff's headaches are particularly important to reassess since the vocational expert opined that if Plaintiff suffered from frequent headaches, this would prevent all work.  (*Id.* 488.)

I now turn to Plaintiff's left ankle.[3]  Plaintiff asserts that Defendant's argument that the record is devoid of any physical impairment that could cause Plaintiff's ankle to give out is not supported by substantial evidence.  It is true that Dr. Pollock ordered an MRI which reported that it was "essentially normal, except for very minimal patchy marrow of edema in the medial aspect of the medial malleolus." (Tr. 355.)  However, Dr. Pollack was concerned enough from the results of the MRI that he referred Plaintiff to Denver Vail Orthopedics.  Denver Vail Orthopedics diagnosed ankle pain and spasm.

---

[3]  I address Plaintiff's postural limitations below in connection with the ALJ's assessment of Plaintiff's RFC.

-17-

It is error for the ALJ to conclude that the MRI was negative given the above sequence of events. *See Winfrey v. Chater*, 92 F.3d 1017, 1021-22 (10th Cir. 1996) (the ALJ is not entitled to substitute his own medical judgment for that of medical professionals).

The ALJ relied on the opinions of the state agency physicians in finding that the left ankle impairment was not severe. The state agency physicians reviewed the records and concluded that Plaintiff had no subjective or objective evidence of any musculoskeletal problem and that Plaintiff's physical impairments were nonsevere. (Tr. 319, 321.) However, those findings were made despite the fact that Dr. Healy reported that objective medical findings substantiated and correlated with Plaintiff's subjective complaints. (*Id*. 347.) Further, as I indicated earlier, the state agency physicians did not examine Plaintiff and did not do a written report explaining what records they reviewed and what they based their decision on. Accordingly, their opinions may have been given undue weight by the ALJ. Also, the ALJ did not properly take into account Denver Vail Orthopedics' finding of spasm in the left ankle which could be an objective finding related to Plaintiff ankle problems. If the record was unclear on this issue, the ALJ had a duty to develop the record. *Maes*, 522 F.3d at 1097.

Also, to the extent the ALJ found that the ankle problems and/or headaches were not severe because Plaintiff and/or her attorney did not demonstrate functional limitations related to the ankle, this was also error. The ALJ has a duty to develop the record on this issue. *See Grogan v. Barnhart*, 399 F.3d 1257, 1264 (10th Cir. 2005) (a social security hearing is "nonadversarial in nature, and thus the ALJ bears responsibility for ensuring that 'an adequate record is developed during the disability hearing consistent with the issues raised' in that hearing") (quotation omitted); *Baca v.*

-18-

*Dept. of Health & Human Servs.*, 5 F.3d 476, 479-80 (10th Cir. 1993) ("The ALJ has a duty to fully and fairly develop the record as to material issues").  Further, the ALJ did not properly consider the fact that Plaintiff testified that her ankle gave out when she was walking and that there is no indication of when this will happen.  (Tr. 434.)  This was a functional limitation.

Finally, I note that ALJ also did not address Dr. Healy's and Dr. Pollack's assessments regarding cervical sprain, left lower lumber sprain, and left hip posttraumatic bursitis.  These impairments should also be addressed by the ALJ on remand.

      2.    <u>Whether the ALJ Erred in Assessing Plaintiff's RFC and her Ability to Return to Past Relevant Work</u>

My finding above that the medical opinions were not properly weighed means that the RFC must also be addressed once a proper weighing of the medical evidence has occurred.  However, I address other errors I find were committed by the ALJ in connection with the RFC below.

RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule".  *See* Soc. Sec R. 96-8p(1), 1996 WL 374184, at *1.  Thus, "'[a] finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant can *hold*

whatever job he finds for a significant period of time.'" *Washington v. Shalala*, 37 F.3d 1437, 1442 (10th Cir. 1994) (emphasis in original) (quotation omitted).

Turning to my analysis, I first agree with Plaintiff that the ALJ never stated what Plaintiff's physical RFC was.  Presumably, because he found that Plaintiff could perform two unskilled, light jobs, he found that Plaintiff could perform light work.  This was not properly developed, however.  Further, the ankle problems that Plaintiff was experiencing and which the ALJ did not properly assess at step two could impact her ability to perform these jobs.  There is also evidence that Plaintiff has a low tolerance for staying in any position.  (Tr. 392.)  These issues need to be properly assessed on remand.

I also find that the ALJ did not properly assess Plaintiff's mental RFC.  The Tenth Circuit has indicated that "[w]hen a claimant suffers from a severe mental impairment that does not meet or equal the criteria of the listings for mental disorders, '[t]he determination of mental RFC is crucial to the evaluation of an individual's capacity to engage in substantial gainful work activity.'" *Washington*, 37 F.3d at 1440 (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A)).  "In assessing a claimant's mental RFC, the ALJ should consider, among other things, the claimant's ability to engage in the activities of daily living; to interact appropriately with the public, supervisors, and co-workers; to focus long enough to complete tasks in a timely fashion; and to adapt to stressful circumstances without either withdrawing from the situation or experiencing increased signs and symptoms of the claimant's mental disorder." *Id.*

In this case the ALJ relied on the opinions of M. Berkowitz in finding that Plaintiff could perform simple, unskilled work.  As noted above, I found that M. Berkowitz's

opinions were not properly weighed.  Further, the ALJ's reliance on M. Berkowitz ignored other findings made by that provider that were clearly relevant to the work assessment in assessing the RFC.  Specifically, M. Berkowitz found that Plaintiff had certain mild limitations and also had moderate limitations in (1) the ability to maintain attention and concentration for extended periods, (2) to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, (3) the ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms; and (4) the ability to set realistic goals or make plans independently of others.  (Tr. 324-25.)  M. Berkowitz also found that Plaintiff had moderate limitations in maintaining social functioning and maintaining concentration, persistence or pace.  (*Id.* 338.)  Since these limitations were not included in the RFC, they were also not given in the hypothetical question.  I find that this was error that requires remand.  *See Confere v. Astrue*, No. 06-4217, 2007 WL 1196520, at *2-3 (10th Cir. 2007) (unpublished) (where ALJ's RFC reflected some of the limitations identified by the state agency physicians but not others and the hypothetical did not include all of the limitations, the Tenth Circuit remanded with instructions to remand to the agency for additional proceedings)  (citing *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007)).

Further, I agree with Plaintiff that M. Berkowitz's finding that Plaintiff could perform simple, repetitive work activity does not correlate to the vocational requirements in the Dictionary of Occupational Titles ["DOT"].  The Tenth Circuit has indicated that "the agency accepts the [DOT's] definitions as reliable evidence. . . . "  *Haddock v. Apfel*, 196 F.3d 1084, 1090 (10th Cir. 1999).  The DOT's rating system is via a formal

General Education Development ["GED"] requirement broken down into the minimum Reasoning, Math, and Language skills required for each job.

The GED's Reasoning Level scale is rated in six "R" (reasoning) Levels with specific, detailed functional requirements for each. Levels R1 though R6 require the mental RFC for progressively more complex thinking in order to perform the job. R1 reasoning is defined as "simple, one or two-step instructions." R1 is the only Reasoning Level in the GED scale that uses the term "simple." *Dictionary of Occupational Titles*, 4th Ed., U.S. Department of Labor, p. 1011. A person such as Plaintiff whose mental RFC is limited to "simple" work would thus arguably lack the mental RFC for jobs at or above R2. There is support for Plaintiff's argument. *See Clay v. Barnhart*, 417 F.3d 922, 931 (8th Cir. 2005) (vocational expert's testimony that the claimant in the hypothetical question who was limited to simple concrete instructions was arguably inconsistent with the DOT's definition of the job of cashier that required level three reasoning). In this case, both of the jobs the ALJ found Plaintiff could do from her past relevant work require a worker to have a mental RFC exceeding R1, as explained in Plaintiff's Opening Brief. Thus, the finding at step four may not have been supported by substantial evidence, particularly given Plaintiff's low I.Q.

The Commissioner argues, however, that the ALJ could rely on the vocational expert's testimony to find that Plaintiff could perform her past relevant work. The vocational expert testified that an individual with Plaintiff's RFC could perform her past relevant work as a convenience store clerk and fast-food worker, as those jobs are performed in the national economy. (Tr. 448). While an ALJ may rely on a vocational source as an expert witness to testify to whether a claimant can perform his or her past

relevant work, *see* 20 C.F.R. §§ 404.1560(b)(2) and 416.960(b)(2), there were no

questions about whether the vocational expert's testimony was consistent with the DOT

and thus no explanation for the purported inconsistency pointed out by Plaintiff.  I find

that this is an error that needs to be addressed on remand.  *Haddock*, 196 F.3d at 1091

("[T]he ALJ must investigate and elicit a reasonable explanation for any conflict between

the Dictionary and expert testimony before the ALJ may rely on the expert's testimony

as substantial evidence to support a determination of nondisability"); *see also Lopes v.

Astrue*, 277 Fed. Appx. 757, 760 (9th Cir. 2008) (unpublished) (to rely on expert

testimony that is inconsistent with the DOT, "the record must contain persuasive

evidence to support the deviation").

The Commissioner also argues that Plaintiff's alleged problems with attendance

and social interaction and phobia with money are based entirely on her subjective

complaints, which were properly discounted by the ALJ.  I disagree.   As noted above,

M. Berkowitz found that Plaintiff had moderate limitations in connection with attendance

and social functioning.  Plaintiff's bipolar disorder could certainly contribute to social

functioning, including the ability to interact with the public and with her supervisors.

As to attendance, Dr. Healy noted that Plaintiff's headaches ranged from three to

four a week and were of such severity that they left her bed-bound, and he diagnosed

headaches and a chronic pain syndrome.  (Tr. 345-50.)  This would appear to support  a

finding that Plaintiff's attendance at work could be impacted by her impairments.

Further, there is evidence in the record that Plaintiff has severe depression cycles

lasting "[a]nywhere from a day to a week to two weeks." (*Id.* 436.)  There is also

evidence that Plaintiff flies into what she describes as "rages", wherein her behavior

-23-

includes inappropriate verbal attacks without provocation.  (*Id.* 439.)  During those periods Plaintiff would arguably be unable to work.  I note that the attendance component is important to properly assess since the vocational expert opined that a person who missed more than two days of work a week in unskilled work would not be employable.  (*Id.* 448.)  The ALJ did not properly assess this.  Further, while some of the above evidence comes from Plaintiff's testimony which the ALJ appeared to give no credence to, this testimony is consistent with Plaintiff's diagnoses of bipolar disorder. This needs to be properly considered.

As to the phobia against handling money, there is evidence in the record that Plaintiff suffers from a specific phobia about this.  A Specific Phobia is a "marked and persistent fear that is excessive and unreasonable, cued by the presence or anticipation of a specific object or situation."  *Diagnostic And Statistical Manual Of Mental Disorders DSM-IV)*, 4th Ed., American Psychiatric Association, (coded as 300.29), page 410. They are in the family of Anxiety Disorders.  The apparent initial basis for Plaintiff's phobia was Plaintiff being robbed at gunpoint while on a job.  (Tr. 440-443.)  Plaintiff had a manifestation of her illness while working at McDonald's in the past.  Plaintiff was convinced that her McDonald's manager had set Plaintiff up to be robbed or be the "fall gal" for a staged robbery.  (*Id.* 442.)  Likely as a result of her illness, Plaintiff testified that she has convinced herself that money is the root of all evil and that she wants nothing to do with personally handling money.  (*Id.* at 440-43.)

The ALJ had absolutely no understanding of either the phobia or the resulting vocational problem:

> ...I just don't understand. So whatever it is she's testifying to, we've got a
> big black hole in my head because I have no idea what she's trying to get
> across to me.

(Tr. 441.)  The ALJ failed to request or seek any professional input into Plaintiff's paranoia about handling money.  Instead, being unable to understand it, he decided to ignore it.  Accordingly, he failed to note or consider the existence of any mental functional limitation that prevented or limited Plaintiff working as a cashier.  This was error.  An ALJ cannot ignore Plaintiff's complaints, even if subjective, simply because he does not understand them.  Moreover, there was medical evidence that could support Plaintiff's complaints.  Dr. Valette opined that Plaintiff should not manage even her own funds.  (Tr. 367.)  This phobia is particularly significant in this case given that the past relevant work that the ALJ found Plaintiff could do (fast food worker and convenience store clerk) both involve cashiering as part of the job tasks.  Accordingly, this needs to be properly assessed on remand.

I also find that the ALJ did not do a proper analysis of Plaintiff's pain, or the functional limitations related to same.  The ALJ rejected chronic pain as a severe impairment.  (Tr. 37.)  Moreover, he appeared to find that Plaintiff's complaints of pain were not credible at all.  I find that this finding is not supported by substantial evidence.  Almost every doctor who examined Plaintiff diagnosed pain, and there were objective findings that supported that diagnosis.  (*Id.* 346—Dr. Healy, 392—Dr. Cookson, 396—Dr. Vanzura).  Indeed, Dr. Kenneally opined that Plaintiff had a Pain Disorder Associated with Both Psychological and a General Medical Condition.  (*Id.* 285.)  The ALJ also noted that there were impairments that could reasonably cause pain.

Moreover, even if there were not objective findings to substantiate the pain, this was not a basis to discount Plaintiff's pain.  *See Turner v. Heckler*, 754 F.2d 326, 330 (10th Cir. 1985) ("subjective pain need not be shown to have an objective physical origin . . . Accordingly, the [defendant] may not find [plaintiff's] complaints of pain unworthy of belief merely because the record reveals no physical cause.") I also note that Dr. Cookson opined that Plaintiff's chronic pain resulted in "low tolerance for staying in any position"(*id.* 392), a postural limitation that was not properly considered.  Also on remand the ALJ must show that 'jobs exist in the national economy that the claimant may perform given the level of pain [she] suffers.'"  *Harrison v. Shalala*, No. 93-5238, 1994 WL 266742, at *5 (10th Cir. 1994) (unpublished) (quoting *Thompson v. Sullivan*, 987 F.2d 1482, 1490-91 (10th Cir. 1993) (further quotations omitted).

I also find some serious inconsistencies in the ALJ's decision in connection with Plaintiff's ability to perform her past relevant work.  On the one hand, the ALJ found that Plaintiff was not credible because of her sporadic work history and the fact that she was unemployed at the time of the January 2004 accident.  On the other hand, the ALJ found that Plaintiff demonstrated the ability to perform unskilled work prior to her onset date despite her history of psychological impairments and her drug use.  He further found that there is no showing that the January 2004 accident caused any permanent aggravation.  Therefore, he stated that "it is logical to conclude that the claimant is still capable of work she did in the past." (Tr. 33.)  However, if Plaintiff had a sporadic work history and was unemployed at the time of the accident, a finding that she was able to perform unskilled work in the past would not necessarily be supported.  This needs to be reassessed on remand.

Further, I question the ALJ's decision to find Plaintiff not credible based on her unemployment prior to the January 2004 accident.  The record shows that Plaintiff was unemployed since 2002 but that she did not actually apply for disability benefits until after the accident.  I agree with Plaintiff that this could be construed to mean that she did not seek benefits until she was truly disabled, making her more credible.  This also needs to be considered on remand.

The ALJ also found that the record showed that Plaintiff showed significant improvement when she was compliant with medication and abstinent from drug use.  (Tr. 32.)  However, he did not state what evidence supported this conclusion.  This needs to be clarified on remand.  Further, the ALJ found that Plaintiff was capable of working even if drug abuse was present.  (*Id.*)  He also did not provide a basis for that opinion or cite to any evidence in the record that supported that.  This was error.  I also note that if Plaintiff was able to work only sporadically before her accident, *i.e.*, when she was abusing drugs, this may well mean that she cannot work with drug use.  This also needs to be addressed on remand.

I also direct the ALJ on remand to consider the combined effects of Plaintiff's impairments.  The law is clear that when a claimant has one or more severe impairments the Social Security [Act] requires the [Commissioner] to consider the combined effects of the impairments in making a disability determination."  *Campbell v. Bowen*, 822 F.2d 1518, (10th Cir. 1987) (citing 42 U.S.C. § 423(d)(2)(C)).  I also direct the ALJ to consider whether, if Plaintiff is not found to be disabled for the full period requested by Plaintiff, she may be disabled for at least a closed period of disability.

### 3. Whether the Appeals Council Improperly Ignored Relevant Post-Hearing Evidence

Finally, Plaintiff argues that the Appeals Council failed to consider the new evidence submitted by Plaintiff after the ALJ's decision. That evidence shows that Plaintiff was again psychiatrically hospitalized in June 2007, less than two months after the decision. Per psychiatrist Dr. Lowermilk, Plaintiff's discharge diagnoses included "BiPolar Disorder, Type 2; Polysubstance Abuse, in remission; and Post Traumatic Stress Disorder." (Tr. 18.) As a result of Plaintiff's then active mental illnesses, Dr. Lowermilk opined that Plaintiff was "disorganized, irritable and suicidal," and was then and for at least 12 months into the future "unable to work at any job." (*Id.* 16-17.) Plaintiff argues that Dr. Lowermilk's report/discharge notes were part of the record for review and were totally ignored by the Appeals Council. I find no merit to this argument.

The Appeals Council stated that this new evidence was not considered because they were dated after the ALJ's decision in April and thus were "..about a later time...and [do] not affect the decision..." (Tr. 12.) This was not legal error. "'The Appeals Council has a duty to consider new and material evidence only where it relates to the period on or before the date of the administrative law judge decision.'" *Bolton v. Barnhart*, 117 Fed. Appx. 80, 83 (10th Cir. 2004) (quoting 20 C.F.R. § 404.970(b)). However, since this case is being remanded and since the new evidence by Dr. Lowermilk is so close in time to the period of Plaintiff's claim, I direct the ALJ to consider this evidence to determine and its impact on the Plaintiff's alleged disability, *i.e.*, whether it supports Plaintiff's claim of being continuously disabled since the date of the 2004 accident.

III.   <u>CONCLUSION</u>

Based upon the errors described above, I find that this case must be reversed and remanded to the Commissioner for further fact finding and analysis consistent with this Order.

Accordingly, it is

ORDERED that this case is **REVERSED AND REMANDED** to the Commissioner for a rehearing pursuant to 42 U.S.C. § 405(g).

Dated July 8, 2009

BY THE COURT:


s/ Wiley Y. Daniel
Wiley Y. Daniel
Chief United States District Judge